**Below is a Memorandum Decision of the Court.**

*Mary Jo Heston*
_____
**Mary Jo Heston
U.S. Bankruptcy Judge**
(Dated as of Entered on Docket date above)

### UNITED STATES BANKRUPTCY COURT
### WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| In re:<br><br>JESSICA LYNN HULET,<br><br>                Debtor.<br><br>CHRISTIAN M. BURGESS,<br><br>                Plaintiff,<br><br>   v.<br><br>JESSICA L. HULET,<br><br>                Defendant. | Case No. 18-43371<br><br>Adversary No. 18-04083<br><br>**MEMORANDUM DECISION** |

     This matter came before the Court for trial on August 23, 2019, on the complaint filed by Christian M. Burgess ("Burgess") to determine the dischargeability of a debt owed by Jessica Lynn Hulet ("Hulet") pursuant to 11 U.S.C. § 523(a)(4) and in the alternative, 11 U.S.C. § 523(a)(6).[1]  Following the testimony of Burgess and Hulet, the Court took the matter

---

[1] Unless otherwise indicated, all chapter, section and rule references are to the Federal Bankruptcy Code, 11 U.S.C. §§ 101- 1532, and to the Federal Rules of Bankruptcy Procedure, Rules 1001-9037.

MEMORANDUM DECISION - 1

under advisement. Based on the evidence admitted, arguments of the parties, and pleadings submitted, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The parties met in March 2012 and began dating shortly thereafter. Hulet testified that she moved into Burgess's home several months later. While Hulet was living with Burgess, Hulet became pregnant with Burgess's child. Hulet was working as an office assistant for Seabrook Land Company at the time. Both parties testified that Hulet quit her employment when she was about seven months pregnant due to complications with her pregnancy.

The parties gave differing testimony regarding their living arrangement and payment of household expenses while Hulet lived in Burgess's home. It is undisputed that Burgess kept a safe in the home in which he placed significant amounts of cash. Burgess testified that he was the only person with access to and knowledge of the combination to the safe. Burgess also stated that he kept an accounting of all cash going in or coming out of the safe. Hulet testified that Burgess gave her access to the safe so that she could put cash from the business in the safe and withdraw cash for various household expenses, including payment of groceries, gas, items for their baby, and household improvements.

The parties also offered very different testimony as to Hulet's role in Burgess's business. Burgess owns a custom screen print and embroidery business. Burgess testified that Hulet had very little involvement in his business, other than to attend a few fairs with him at which he operated a booth. Hulet, on the other hand, testified that after she left her employment, she assisted Burgess with all aspects of his business. Both parties stated that Hulet was never on the company's payroll, nor did she ever receive a paycheck from the business.

The parties' relationship was volatile and quickly deteriorated. Hulet described Burgess as an abusive man—physically, emotionally, and psychologically. Burgess testified that his relationship with Hulet was very unstable and that Hulet would leave his house at least once a week and go stay somewhere else, typically with her mother. According to Burgess, this occurred some 20 to 25 times during their two-year relationship. Hulet testified that her residence in Burgess's house was more consistent.

The facts surrounding the end of the parties' relationship are less clear. Burgess testified that he asked Hulet to leave after he discovered that she allegedly obtained the combination to his safe without his permission and removed $11,835 in cash. Burgess stated that Hulet's mother, Dianne T. Hill ("Hill"), came over and both Hill and Burgess helped Hulet move her things out of his home. Hulet tells a very different story. According to Hulet, Burgess confronted her in the middle of the night on June 13, 2014, engaged in a physical altercation, and kicked her out of the house immediately. After Burgess threw Hulet's clothes out of the house, Hulet left with her clothes and their daughter. Hulet then went to her mother's home where she alleges that Burgess broke in later that night, confronted her in her bed, and threw her broken cell phone at her. Hulet testified that she was scared. Although Hulet testified that she was going to report Burgess's behavior to the police, she never did.

Hulet testified that the following morning, Hulet dropped their daughter off at Burgess's home before she went to work, as she needed child care. The parties agree that later that day, Burgess came over to Hill's home and a document, Exhibit P1 ("Agreement"), was signed by Hulet and Burgess, and by Hill as a witness. The Agreement, dated June 14, 2014, states:

> "I Jessica Lynn Hulet agree to pay back $11,835 (eleven thousand eight hundred and thirty five dollars) that I have stolen from Christian M. Burgess, in the amount of $250 per month until the full amount of $11,835 is paid in full. If there is a breach in contract I am acknowledging and agree to take this matter to

a court of law to settle this dispute. I (Jessica Hulet) agree to pay attorney fees if this matter is taken to court."

Burgess admits that Hill typed up the document on her computer from something he had handwritten. According to Hulet, her mom was crying while Burgess was there, and Hulet herself was afraid. Hulet testified that Burgess threatened to take away her daughter and call the police if Hulet did not sign the Agreement.

Hill also typed up a payment schedule, which indicates payments of $85 were made on June 14, $45 on June 15, $40 on June 16, and $275 on July 8, 2014. All payments were made in cash, and no further payments are listed. The remaining balance owing as of July 8, 2014, is listed as $11,475.[2]

Burgess filed a complaint, dated May 26, 2016, against Hulet in Grays Harbor District Court for the State of Washington seeking a judgment in the principal amount of $11,475, plus prejudgment interest and attorney's fees and costs. Hulet testified that she never received a copy of the complaint. A judgment was entered on May 31, 2017, in the principal judgment amount of $11,475, interest through June 13, 2017, of $4,646.54, attorney fees of $3,400, and costs of $142.31. Burgess was in the process of garnishing Hulet's wages when she filed a Chapter 7 bankruptcy petition on October 3, 2018. On Schedule F, Hulet lists a judgment owed to Burgess, incurred in 2017, with "Last 4 digits of account number" 0925, which is the last 4 digits of the case number in Grays Harbor County District Court. The claim amount is listed as $24,527.10. No boxes are checked indicating that the claim is contingent, unliquidated or disputed.

---

[2] The first entry on the payment schedule is dated June 13, 2014, and indicates a remaining balance of $11,920. Neither party provided any explanation for why this amount was listed rather than the $11,835 allegedly stolen by Hulet. As the entry for June 14, 2014, indicates $11,835, which is consistent with the amount listed in the pleadings and state court documents, the Court will assume for purposes of this decision that this is the correct amount at issue.

MEMORANDUM DECISION - 4

On December 31, 2018, Burgess filed this adversary proceeding, alleging that the debt owed to him is nondischargeable under § 523(a)(4) and/or § 523(a)(6).

**CONCLUSIONS OF LAW**

In a nondischargeability action, the plaintiff has the burden of proof of each element by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 661 (1991).

A. <u>523(a)(4) claim</u>

Burgess alleges that the debt owed to him is nondischargeable pursuant to § 523(a)(4), as a debt arising from embezzlement or larceny.[3] The elements of embezzlement are (1) property owned by another is rightfully in the possession of debtor; (2) debtor appropriates it for a use other than the use for the property was entrusted to debtor; and (3) circumstances indicating fraud. *Transamerica Commercial Fin. Corp. v. Littleton (In re Littleton)*, 942 F.2d 551, 555 (9th Cir. 1991).

Larceny is similar to embezzlement. The elements of larceny are (1) the fraudulent and wrongful taking and carrying away of the property of another; (2) with the intent to convert it to the taker's use; and (3) without the consent of the owner. The difference between larceny and embezzlement is that the larcenous debtor takes possession of the property unlawfully. *Lucero v. Montes (In re Montes)*, 177 B.R. 325, 331 (Bankr. C.D. Cal. 1994).

Burgess testified that he was the only person with access to the safe and that he never gave access, or the combination to the safe, to Hulet. It was his testimony that Hulet

---

[3] The pleadings are slightly unclear as to what claims are asserted. For instance, the body of the complaint alleges that the debt is nondischargeable because Hulet's acts constitute larceny, while the prayer indicates that her acts constitute embezzlement. The prayer in Burgess's Proposed Findings of Fact & Conclusions of Law merely states that her acts constitute embezzlement. However, both at trial and in his trial brief, Burgess argued nondischargeability under both. Hulet was on notice that both claims were being asserted so the Court will address both in its decision.

MEMORANDUM DECISION - 5

somehow obtained the safe combination from his iPad and took his cash without his consent. Hulet tells a very different story. Hulet testified that Burgess gave her the safe combination and that she accessed it frequently, to both deposit cash for Burgess and remove cash for household expenses. Either version of events, however, leads to the same conclusion in light of the Agreement. Whether Hulet rightfully or wrongfully accessed the funds in the safe, it is undisputed that she signed and dated an agreement admitting to having "stolen" $11,835 from Burgess and agreeing to a payment plan.

The meaning of the term "stolen" has not been put at issue by either party. The meaning and implications of that term, however, are critical to the nondischargeability analysis. To conduct this analysis the Court must follow the principles governing contract interpretation. Contracts are generally interpreted according to state law. *Gerwer v. Salzman (In re Gerwer)*, 253 B.R. 66, 73 (9th Cir. BAP 2000). Washington follows the objective manifestation theory of contracts. Under this approach, the court attempts to determine the parties' intent by focusing on the objective manifestations of the agreement, rather than on the unexpressed subjective intent of the parties. *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262, 267 (2005). Thus, when interpreting contracts, the subjective intent of the parties is generally irrelevant if the intent can be determined from the actual words used. The term "stolen" is not defined in the parties' agreement. Undefined terms in a contract are given their plain, ordinary, and popular meaning. *Universal/Land Constr. Co. v. City of Spokane*, 49 Wn. App. 634, 637, 745 P.2d 53, 55 (1987); *Farmers Ins. Co. of Wash. v. Miller*, 87 Wn.2d 70, 73, 549 P.2d 9, 11 (1976).

To determine the ordinary meaning of an undefined term, courts may look to standard English language dictionaries. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 113 Wn.2d 869, 877,

MEMORANDUM DECISION - 6

784 P.2d 517, 511 (1990). Black's Law Dictionary defines "steal" as "1. To take (personal property) illegally with the intent to keep it unlawfully. 2. To take (something) by larceny, embezzlement, or false pretenses." *Black's Law Dictionary* (11th ed. 2019).

In the Agreement, Hulet admits having "stolen" $11,835 from Burgess. By definition, she has admitted to taking the property illegally with the intent to keep it unlawfully, or to taking the funds by larceny or embezzlement. Thus, the unexpressed subjective intent of either party is irrelevant. Rather, Hulet's admission standing alone is sufficient to support Burgess's claim that the debt is nondischargeable under § 523(a)(4).[4]

Hulet argues that the Agreement should not be considered because it was entered into under duress. Duress is a defense that must be proven by the "victim" who seeks to escape liability by clear, cogent, and convincing evidence. *Retail Clerks Health & Welfare Trust Funds v. Shopland Supermarket, Inc.*, 96 Wn.2d 939, 944, 640 P.2d 1051, 1054 (1982) (citing *Barker v. Walter Hogan Enters., Inc.*, 23 Wn. App. 450, 596 P.2d 1359 (1979)); *In re Welfare of J.N.*, 123 Wn. App. 564, 573, 95 P.3d 414, 419 (2004). "The mere fact that a contract is entered into under stress or pecuniary necessity is insufficient." *Shopland*, 96 Wn.2d at 944. There must be evidence that the duress "resulted from the other's wrongful or oppressive conduct." *Shopland*, 96 Wn.2d at 944. "Generally, circumstances must demonstrate a person was deprived of his free will at the time he entered into the challenged agreement in order to sustain a claim of duress." *Shopland*, 96 Wn.2d at 944-45.

Hulet testified that she signed the Agreement because she was afraid of Burgess based on prior physical and mental abuse, Burgess threatened to call the police regarding the

---

[4] Burgess also argues in his trial brief that Hulet is collaterally estopped from challenging the nondischargeability of this debt based on the Grays Harbor County District Court judgment. Washington law, however, holds that a pure default judgment does not support the "actually litigated test" under the first prong of the collateral estoppel test. *Stephens v. Bigelow (In re Bigelow)*, 271 B.R. 178, 184 (9th Cir. BAP 2001).

MEMORANDUM DECISION - 7

missing cash, and he threatened to keep their daughter from Hulet if she refused. While Burgess denied making any threats if the Agreement was not signed, he admitted that there may have been talk about contacting the police at some point and that he in fact contacted the police about filing a criminal report when Hulet later defaulted on payments.

The Court does not find Burgess's statement that he might contact the police, even if made prior to Hulet signing the Agreement, to be sufficient evidence to establish a duress claim. "[A] mere threat to exercise a legal right made in good faith is neither duress nor coercion in law." *Pleuss v. City of Seattle*, 8 Wn. App. 133, 137, 504 P.2d 1191, 1194 (1972); *see also Krull v. Lawson*, 192 Wn. App. 1010, 2016 WL 126440, at *6 (2016) (unpublished opinion) (holding that a threat to evict a tenant if she did not agree to a lease addendum did not constitute duress as the landlord had valid grounds to justify the threatened action). For this same reason, the allegation that Burgess threatened to keep Hulet from their daughter if she refused to sign the Agreement also does not support a duress defense, as Hulet could have sought recourse through state family court. Moreover, Burgess unequivocally denied ever making such a threat.

Regarding the allegations of physical and mental abuse, Hulet testified that she was afraid of Burgess the night he kicked her out of the house and the next day when she signed the Agreement. Despite this, Hulet testified that the morning after she was kicked out, she entrusted Burgess to care for their daughter while she went to work. Burgess's testimony regarding the events that occurred between the parties differed significantly from Hulet's. "The clear, cogent, and convincing standard does not require that the plaintiff's proof be uncontradicted. *Noord v. Downs*, 51 Wn.2d 611, 615, 320 P.2d 632 (1958). However, the standard is not met where the only evidence consists of uncorroborated conflicting testimony

by the parties." *Rolph v. McGowan*, 20 Wn. App. 251, 256, 579 P.2d 1011, 1014 (1978) (addressing the clear, cogent, and convincing standard in the context of contract reformation due to mutual mistake). The only evidence before the Court is the testimony of Hulet and Burgess, and the Plaintiff's exhibits. Hulet failed to provide any corroborating evidence or testimony to support her position, offering no exhibits or testimony other than her own.

Notably, at trial, counsel for Hulet stated an intent to call Hill as a "rebuttal witness." Counsel for Burgess objected on the basis that Hill was never disclosed as a witness. It soon became clear that Hill was not a rebuttal witness but an undisclosed witness in the defendant's case. The Notice of Trial and Order Setting Deadlines required trial briefs to be filed by August 13, 2019, and to include the identification of witnesses to appear for that party. Notice of Trial 4:19-20, ECF No. 8. Hulet's trial brief filed August 13, 2019, failed to disclose any witnesses. Additionally, at the status conference held on August 15, 2019, Hulet's attorney again failed to disclose any witnesses other than his client. At trial, the Court indicated its intent to sustain the objection due to the nondisclosure of the witness and the defense's inability to call Hill as a "rebuttal" witness."[5] The Court also determined that Fed. R. Civ. P. 37(c) applied and read the parties the relevant provisions of this rule providing that Hulet could not use such witness at trial, unless it was established that the failure to disclose was substantially justified or harmless. The Court also read Rule 37(c)(1)(A-C), providing that the Court may impose alternative sanctions in addition to or instead of this sanction. Before

---

[5] Counsel for Hulet argued that Hill was a rebuttal witness and therefore did not need to be disclosed. However, rebuttal testimony is limited to "new unforeseen facts brought out in the other side's case." *Cates v. Sears, Roebuck & Co.*, 928 F.2d 679, 685 (5th Cir. 1991). "[A] defense witness whose purpose is to contradict an expected and anticipated portion of the plaintiff's case in chief can never be considered a 'rebuttal witness,' or anything analogous to one." *Morgan v. Commercial Union Assurance Cos.*, 606 F.2d 554, 556 (5th Cir. 1979). Hill was expected to provide testimony surrounding the creation and signing of the Agreement and corroborating testimony to Hulet's duress defense. Such testimony is an anticipated portion of Hulet's case as it was her defense.

MEMORANDUM DECISION - 9

the Court could rule on the appropriate remedy, however, Hulet's counsel withdrew his request. *See* Fed. R. Civ. P. 37(c)(1), made applicable to adversary proceedings by Fed. R. Bankr. P. 7037 (providing that the party may not use such witness at trial unless the failure was substantially justified or is harmless, or the court may impose alternative sanctions set forth in Rule 37(c)(1)(A-C)).

It is clear from the evidence that the parties' volatile relationship and resulting breakup was traumatic and stressful for both Hulet and Burgess. Contributing to this was the involvement of the parties' daughter and Hulet's need to find a new home. Evidence of a stressful situation, however, is not the standard required to invalidate a signed agreement based on duress. The burden to establish duress is high—clear, cogent and convincing evidence. The Court finds that based on the conflicting testimony of Hulet and Burgess, and the Plaintiff's exhibits, and absent any evidence corroborating Hulet's testimony, Hulet has failed to meet this standard.

Even if Hulet established that she signed the Agreement under duress, there is evidence that Hulet ratified the Agreement by making four cash payments as set forth on the payment schedule: $85 on June 14, $45 on June 15, $40 on June 16, and $275 on July 8, 2014. *See W. Washington Cement Masons Health & Sec. Tr. Funds v. Hillis Homes, Inc.*, 26 Wn. App. 224, 234, 612 P.2d 436, 442 (1980) (where the court determined the trial court did not err by concluding that the employer was estopped to deny the binding nature of an agreement by ratifying its terms through payment of the agreed upon contributions). Although not argued by either party, this is an additional basis to deny the duress defense.

The Court concludes that the document dated June 14, 2014, is a valid agreement in which Hulet admits that she has "stolen" $11,835 from Burgess. By definition, to "steal" is to

take someone else's property illegally. Therefore, Hulet's admission, standing alone, is sufficient to establish that the debt is nondischargeable under § 523(a)(4), and the Court concludes that the debt is nondischargeable under § 523(a)(4) for larceny. Even if Hulet had permission to access the funds, she admits through the Agreement that she took the funds illegally, which constitutes embezzlement. Under either scenario, Burgess has established by a preponderance of the evidence that the debt is nondischargeable under § 523(a)(4).

B. <u>523(a)(6) claim</u>

In the alternative, Burgess alleges that the debt is also nondischargeable under § 523(a)(6). Section 523(a)(6) excepts from discharge debts for "willful and malicious injury by the debtor to another entity or to the property of another entity." To show that a debtor's conduct is willful requires proof that the debtor deliberately or intentionally injured the creditor, and that in doing so, the debtor intended the consequences of his act, not just the act itself. *Kawaauhau v. Geiger*, 523 U.S. 57, 60-61 (1998); *In re Su*, 290 F.3d 1140, 1143 (9th Cir. 2002). When determining intent under § 523(a)(6), there is a presumption that the debtor knows the natural consequences of his actions. *Ormsby v. First Am. Title Co. of Nev. (In re Ormsby)*, 591 F.3d 1199, 1206 (9th Cir. 2010). For conduct to be malicious, the creditor must prove that the debtor (1) committed a wrongful act; (2) done intentionally; (3) which necessarily causes injury; and (4) was done without just cause or excuse. *In re Su*, 290 F.3d at 1143. "Malice may be inferred based on the nature of the wrongful act." *Ormsby*, 591 F.3d at 1206. The wrongful act must be committed intentionally, rather than the injury itself. *Jett v. Sicroff (In re Sicroff)*, 401 F.3d 1101, 1106 (9th Cir. 2005).

Conversion of another's property without his knowledge or consent, done intentionally and without justification and excuse, to the other's injury, constitutes a willful and malicious injury for § 523(a)(6). *Del Bino v. Bailey (In re Bailey)*, 197 F.3d 997, 1000 (9th Cir. 1999).

Hulet signed the Agreement admitting to have stolen Burgess's money. The Court has previously determined that Hulet is not able to invalidate the Agreement on the basis of duress. By its definition, the theft of a person's funds encompasses the intentional conversion of Burgess's money without his knowledge or consent, and the loss of such funds is an injury to Burgess. Burgess has established by the preponderance of the evidence that this debt is also nondischargeable under § 523(a)(6).

///End of Memorandum Decision///